IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HARLEY BRADY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Case No. 3:17-CV-883-MAB** |
| ) | |
| WEXFORD HEALTH SOURCES, INC., ) | |
| JOHN COE, and ) | |
| DEE DEE BROOKHART, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is before the Court on the motions for summary judgment filed by Defendants John Coe, Tammy Kimmel,[1] and Wexford Health Sources (Doc. 121) and the Warden of Lawrence Correctional Center (Doc. 124).[2]

### INTRODUCTION

On August 21, 2017, Plaintiff Harley Brady filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging deprivations of his constitutional rights while incarcerated at Lawrence Correctional Center. (Doc. 1; *see also* Doc. 19). Various claims and Defendants have been

---

[1] Plaintiff voluntarily dismissed Defendant Tammy Kimmel (Doc. 137). The motion for summary judgment is therefore moot as to her.

[2] The Warden at Lawrence, Kevin Kink, was the Warden at Lawrence Correctional Center at the time the merit-review order was entered, which added the warden as a Defendant in his/her official capacity only for the purpose of implementing any injunctive relief that might be ordered (Docs. 22, 130). By the time the motions for summary judgment were filed, however, Dee Dee Brookhart was the warden (*see* Doc. 125). Consequently, Brookhart was substituted in and replaced Kink as a Defendant in this case (Doc. 130). For clarity of this Order, the Court refers to the Warden of Lawrence Correctional Center by their title rather than by their name.

dismissed throughout the course of litigation, and the following claims are what currently remain:

> **Count 1:** Eighth Amendment claim against Dr. Coe for exhibiting deliberate indifference to Plaintiff's serious medical needs (gastrointestinal and/or thyroid problems including acid reflux, alternating bouts of constipation and diarrhea, cramping, vomiting and dry heaving, exhaustion, inability to stay warm, and a rash) and against Wexford for maintaining policies and customs that caused the same.

> **Count 2:** Eighth Amendment claim against Wexford for maintaining policies and customs that resulted in a failure to timely refill Plaintiff's necessary prescription medications.

(Doc. 22; Doc. 69; Doc. 75; Doc. 137). Additionally, the Warden at Lawrence was added as a Defendant in his/her official capacity only and remains a Defendant for the purpose of implementing any injunctive relief that might be ordered (Docs. 22, 130).

Defendants filed their respective motions for summary judgment on August 31, 2020 (Docs. 121, 124). Plaintiff filed his responses in opposition to the motions for summary judgment in December 2020 (Docs. 138, 139). Defendant Brookhart did not file a reply brief but Defendants Dr. Coe and Wexford did (Doc. 140). Their reply brief, for the most part, simply rehashes the merits of their motion to strike Plaintiff's exhibits (Doc. 140; *see also* Doc. 141).

FACTUAL BACKGROUND

Plaintiff Harley Brady entered IDOC custody at the receiving center at Stateville Correctional Center in approximately October 2014 (Doc. 125-1, pp. 53, 54; Doc. 19, p. 11). Plaintiff was then sent to Lawrence Correctional Center on November 3, 2014 but was initially transferred back and forth to Stateville periodically for court writs related to his

criminal case (Doc. 125-1, pp. 54–55, 56). It appears that Plaintiff remained at Lawrence until approximately August 2021, when he was transferred to Centralia (*see* Doc. 149).

Plaintiff has a number of physical and mental health issues (*see* Doc. 125-1, pp. 53–54). He testified that when he entered IDOC custody in November 2014, he had bulging discs in his back and minor residual pain from a previous hernia surgery (*Id.* at pp. 56, 62). He was then diagnosed with the Hepatitis C virus ("HCV") at Stateville and was enrolled in the HCV chronic care clinic, where inmates are clinically evaluated and laboratory testing is completed every six months (*Id.* at pp. 56, 88–89, 91). Plaintiff testified that he also started having heartburn at Stateville (*Id.* at p. 62). He said "it's not heartburn like you ate spicy food, it's like a deep burn that I can't get away from" (*Id.* at p. 57).

## A. Medical Treatment

During the seven or so years that Plaintiff was at Lawrence, he saw a variety of medical providers and received care for his various medical conditions, including HCV, gastroesophageal reflex disease ("GERD"), back pain, hypothyroidism, and an issue with his skin (*see* Doc. 122-2; Doc. 138-1; Doc. 138-3, pp. 7–21). The full scope of Plaintiff's medical care is unclear, however, because neither party provided the Court with a comprehensive narrative or a full copy of his medical records. Dr. Coe provided the Court with only nine pages of Plaintiff's medical records (Doc. 122-2, p. 1). He did not even include records from all the visits he had with Plaintiff. He instead chose to rely almost exclusively on Plaintiff's recollection of the medical records, as testified to at his deposition (*see* Doc. 122). For his part, Plaintiff provided approximately 70 additional

pages of his medical records (Doc. 138-1, Doc. 138-3, pp. 7–21). It is clear there is far more that the Court did not receive, however, the selection provided by Plaintiff is sufficient to give the Court a general sense of Plaintiff's care, along with some relevant specifics. The following facts recount the relevant medical care Plaintiff received as set forth in the evidence presently before the Court.

Plaintiff testified at his deposition that he saw Dr. Coe for the first time on February 11, 2015 (Doc. 125-1, p. 70; *see also* Doc. 138, p. 16; Doc. 19, p. 13). There are no records from this visit (*see* Doc. 122-2; Doc. 138-1). Dr. Coe diagnosed Plaintiff with GERD[3] and prescribed Zantac[4] and Tums[5] (Doc. 125-1, p. 70, 74; Doc. 138, p. 16). Plaintiff said he complained about other symptoms at this appointment, including "food slow to leave stomach, vomiting and dry heaving, severe gas, intestinal cramps, irregular bowels," (Doc. 138, p. 16), and "being tired all the time" (Doc. 125-1, pp. 74–76). Plaintiff also told Dr. Coe that he believed his symptoms might be related to soy allergy or a thyroid problem (*Id.*; Doc. 138, p. 16). Plaintiff said Dr. Coe refused to offer any treatment for these additional symptoms (Doc. 138, p. 16). Specifically, Plaintiff wanted a "medical

---

[3] Gastroesophageal reflux disease (GERD) is a condition in which the stomach contents leak backward from the stomach into the esophagus, the tube that carries food from your mouth to your stomach. It happens when the muscle at the end of your esophagus does not close properly. MEDLINE PLUS, *Gastroesophageal Reflux Disease*, https://medlineplus.gov/ency/article/000265.htm (last visited Sept. 17, 2021).

[4] Zantac (generic name ranitidine) is an H2 blocker that works by decreasing the amount of acid made in the stomach. It is used to treat ulcers and GERD, amongst other things. MEDLINE PLUS, *Ranitidine*, https://medlineplus.gov/druginfo/meds/a601106.html (last visited Sept. 17, 2021).

[5] Tums contain a dietary supplement called calcium carbonate, which is used as an antiacid to relieve heartburn, acid indigestion, and upset stomach. MEDLINE PLUS, *Calcium Carbonate*, https://medlineplus.gov/druginfo/meds/a601032.html (last visited Sept. 17, 2021).

diet" with no soy, and he also thinks that Dr. Coe should have tested his thyroid-stimulating hormone ("TSH")[6] level (Doc. 125-1, pp. 75, 76).

Plaintiff testified that because Dr. Coe did not do anything regarding his concerns about a thyroid issue, he brought them up to Dr. Dina Paul during an HCV clinic visit, and she ordered lab work (Doc. 125-1, p. 89). Plaintiff further testified that his liver enzymes were really elevated—"astronomical"—and Dr. Paul thought a thyroid problem could be the cause (*Id.* at pp. 87–90). There are no records from this purported visit with Dr. Paul (*see* Doc. 122-2, Doc. 138-1). There are, however, records showing that Plaintiff had labs drawn on May 27, 2015, and his TSH level was 3.42, which was within the range of normal (normal is 0.35–4.0) and meant his thyroid was likely functioning normally (Doc. 138-1, p. 29).

Plaintiff next saw Dr. Coe on July 13th, apparently to have his antacid prescriptions renewed (Doc. 138-1, p. 3; *see also* Doc. 19, p. 16; Doc. 138, p. 25). With respect to the reason for the visit, Dr. Coe simply wrote "see [nurse sick call] 7/7" (*Id.*). Dr. Coe also noted that Plaintiff had "never been checked for H. pylori" (*Id.*).[7] Dr. Coe's diagnosis for Plaintiff was GERD and he ordered an H. pylori test and prescribed Plaintiff

---

[6] TSH signals the thyroid gland to make hormones that control your metabolism, or how your body uses and stores energy. Testing the level of TSH in your blood can reveal if your thyroid gland is functioning normally. LAB TESTS ONLINE, *Thyroid-Stimulating Hormone,* https://labtestsonline.org/tests/thyroid-stimulating-hormone-tsh (last visited Sept. 17, 2021).

[7] Helicobacter pylori (H. pylori) is a bacteria that can infect your stomach and cause peptic ulcers. Signs or symptoms of an H. pylori infection include an ache or burning pain in the abdomen, nausea, loss of appetite, frequent burping, bloating, and unintentional weight loss. MAYO CLINIC, *Helicobacter pylori infection,* https://www.mayoclinic.org/diseases-conditions/h-pylori/symptoms-causes/syc-20356171 (last visited Sept. 17, 2021).

Pepcid[8] and Tums (*Id.*). It appears that Dr. Coe ordered a six-month supply of both medications, although the medical record is not entirely legible (*see id.*). Dr. Coe also gave Plaintiff "diet advice" (*Id.*). According to Plaintiff, at this appointment, he once again complained about other symptoms, like food slow to leave stomach, vomiting, severe and foul-smelling gas, intestinal cramps, and irregular bowels (Doc. 138, pp. 16, 25–26; Doc. 125-1, pp. 77, 78). Plaintiff said he also raised his concerns that he might have a soy allergy or a thyroid problem. But Dr. Coe did not pay attention to or document any of these symptoms or concerns and would not place Plaintiff on a "no soy" diet. Plaintiff thinks Dr. Coe could have done more, like prescribe him Gas-X or Miralax (Doc. 125-1, p. 78).

Plaintiff next saw Dr. Coe seven months later, on February 12, 2016 (Doc. 138-1, p. 5). Dr. Coe wrote in the notes from this visit that Plaintiff's "GERD symptoms [were] not well relieved." He renewed Plaintiff's prescriptions for Pepcid and Tums but also added Prilosec.[9] He gave Plaintiff a two-month supply of each, ordered the H.pylori test again, and ordered a follow-up in two months. A couple weeks later, when the lab results were back, Dr. Coe noted that Plaintiff's H. pylori level was 0.5 and wrote "Does not have infection. No action" (*Id.* at p. 8). Plaintiff says that Dr. Coe once again ignored his other symptoms, including "food slow to leave stomach, reflux containing food particles,

---

[8] Pepcid (generic name famotidine) is an H2 blocker that works by decreasing the amount of acid made in the stomach. It is used to treat ulcers and GERD, amongst other things. MEDLINE PLUS, *Famotidine*, https://medlineplus.gov/druginfo/meds/a687011.html (last visited Sept. 17, 2021).

[9] Prilosec (generic name omeprazole) is a proton-pump inhibitor that works by decreasing the amount of acid made in the stomach. It is used alone or with other medications to treat the symptoms of GERD. MEDLINE PLUS, *Omeprazole*, https://medlineplus.gov/druginfo/meds/a693050.html (last visited Sept. 17, 2021).

vomiting, severe gas, intestinal cramps, irregular bowels, extreme exhaustion, and rash," and his concerns of a potential soy allergy or a thyroid problem (Doc. 138, pp. 16, 25–26). Dr. Coe also refused his requests to see a specialist for a second opinion, for a no-soy diet, and to have his TSH level tested, citing the test done nine months prior in May 2015 that showed Plaintiff's TSH level was 3.42 (*Id.* at pp. 16, 26).

Six days after his appointment with Dr. Coe, Plaintiff had a telemedicine visit with Dr. Paul in the HCV chronic care clinic (Doc. 138-1, p. 7). His labs were drawn in advance of this appointment, (*Id.* at p. 5), although the results of those tests are not in the record (*see* Doc. 122-2, Doc. 138-1). The evidence suggests that his list of complaints to Dr. Paul was different than his list of complaints to Dr. Coe just six days prior. Specifically, the evidence indicates that he complained to Dr. Paul that he had gained a lot of weight, was always cold and tired, and had frequent headaches, joint aches, and back aches (Doc. 138, pp. 25–26). Notes from the visit with Dr. Paul are not in the record, and it is not clear what action she took (*see* Doc. 122-2, Doc. 138-1). It does, however, appear that Dr. Paul, at the very least, ordered Lawrence medical staff to follow-up with Plaintiff because notes from an appointment on February 29th indicate that it was a "[follow-up] per Dr. Paul [with] fever, chills, [headache]" (Doc. 138-1, p. 7).[10] The entire note is not legible, but the legible parts indicate that Plaintiff denied any fever, chills, or headache, but he did complain of a stuffy nose, a rash on his back, muscle aches, and being tired (*Id.*). The practitioner diagnosed him with sinusitis with headaches, dermatitis, and fatigue (*Id.*). The

---

[10] This appointment was not with Dr. Coe. The Court is unable to determine from the note who the practitioner was, but the handwriting is markedly different from Dr. Coe's.

practitioner prescribed nasal spray and amoxicillin for the sinusitis, Benadryl for the rash, ordered labs, including TSH, and a follow-up in two weeks (*Id.*).

Plaintiff's labs showed his TSH was high at 4.85 (normal is 0.35–4.0) (Doc. 138-1, pp. 31, 34).[11] At the follow-up appointment on March 15, 2016, he was diagnosed with bacterial dermatitis and hypothyroidism (*Id.* at p. 8).[12] He was prescribed "minocyclenol," presumably for the bacterial dermatitis (*Id.* at pp. 8, 27).[13] He was also prescribed a thyroid medication called levothyroxine, 0.25mg per day, until December (*Id.*). The practitioner ordered follow-up testing of Plaintiff's TSH level, a follow-up appointment in the general medicine clinic, and educated Plaintiff on diet and exercise, amongst other (illegible) things (*Id.*).

Plaintiff's labs were drawn on two weeks later on April 1st and showed that his TSH level had dropped to 3.71, which was normal (normal is 0.35–4.0) (Doc. 138-1, p. 32). On April 13th, he had a follow-up appointment with a Physician's Assistant ("PA") (Doc. 138-1, p. 9). Plaintiff testified that prior to this appointment, he had been accidentally taking twice the dosage of levothyroxine than was prescribed; he was prescribed 0.25mg per day but he was taking 0.50mg per day (Doc. 125-1, p. 86). The PA provided "lots of

---

[11] High TSH levels may indicate that your thyroid is underactive and needs to be stimulated more, which is called hypothyroidism. Symptoms of hypothyroidism include fatigue, depression, weight gain, feeling cold, painful joints and muscles, dry skin, thin and/or dry hair, slow heart rate, and constipation. LAB TESTS ONLINE, *Thyroid-Stimulating Hormone,* https://labtestsonline.org/tests/thyroid-stimulating-hormone-tsh (last visited Sept. 17, 2021).

[12] Again, this appointment was not with Dr. Coe. It appears it was with the same practitioner who saw him on February 29, 2016 and ordered the follow-up appointment.

[13] There does not appear to be a drug that exists by this name. However, there is a drug called minocycline that is an antibiotic used to treat certain infections of the skin. MEDLINE PLUS, *Minocycline*, https://medlineplus.gov/druginfo/meds/a682101.html (last visited Sept. 17, 2021).

education . . . on how to take levothyroxine," and Plaintiff was continued on 0.25mg of levothyroxine (Doc. 138-1, pp. 9, 27; Doc. 138, p. 17).

A week later on April 20th, Plaintiff was seen at nurse sick call for indigestion/heart burn (Doc. 138-1, p. 10). The nurse wrote that Plaintiff reported "burning going up throat" and that the pain was related to food intake (*Id.*). The nurse gave him Tums and Pepcid and referred him to see the doctor, noting that Plaintiff's GERD medications were set to expire on April 22nd (*Id.*). Plaintiff saw Dr. Coe two days later on April 22nd (*Id.* at p. 11). Dr. Coe referred back to the nurse's notes regarding the GERD and also wrote "repeat problem severe skin problem (illegible word)." Dr. Coe's diagnosis was "GERD (hiatal hernia)"[14] and folliculitis. Dr. Coe prescribed a six-month supply of Hibiclens[15] soap to treat Plaintiff's folliculitis (Doc. 138-1, pp. 11, 28). For Plaintiff's GERD, Dr. Coe renewed Plaintiff's prescriptions for Prilosec, Tums, and Pepcid, and also added on metoclopramide,[16] giving Plaintiff a six-month supply of each (*Id.* at pp. 11, 28). Plaintiff said Dr. Coe refused his requests to refer him "for verification or surgery" for the hiatal hernia and to see a dermatologist about his rash (Doc. 138, pp.

---

[14] A hiatal hernia is a condition in which the upper part of the stomach bulges through an opening in the diaphragm, which is the thin muscle that separates the chest from the abdomen. The diaphragm helps keep acid from coming up into the esophagus. A hiatal hernia can increase the chance of getting GERD or make GERD symptoms worse. MEDLINE PLUS, *Hiatal Hernia*, https://medlineplus.gov/hiatalhernia.html (last visited Sept. 17, 2021).

[15] Hibiclens is an antibacterial and antimicrobial soap. DAILYMED, *Hibiclens,* https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=4275eb53-1a7e-4a91-aac1-1085f40fac88 (last visited Sept. 17, 2021).

[16] Metoclopramide (brand name Reglan) is a prokinetic agent that works by speeding the movement of food through the stomach and intestines. It is used to relieve heartburn and speed the healing of ulcers and sores in the esophagus in people who have GERD that did not get better with other treatments. MEDLINE PLUS, *Metaclopramide,* https://medlineplus.gov/druginfo/meds/a684035.html (last visited Sept. 17, 2021).

17, 18). Dr. Coe also refused to treat, or even document, his issues with severe gas and irregular bowels and his "problems adjusting to the lower dose of thyroid medication," including headaches, vertigo, and being cold and tired (*Id.*).

A lab test in mid-May showed that Plaintiff's TSH level was 4.72, which is high (normal is 0.35–4.0) (Doc. 138-1, p. 35). On May 23, 2016, Dr. Coe saw Plaintiff at an appointment to follow-up on his folliculitis and GERD (Doc. 138-1, p. 13). Dr. Coe noted that Plaintiff's folliculitis was "controlled," and he renewed Plaintiff's prescription for Hibiclens soap for another six months. He also restarted Plaintiff's GERD medications, which had been discontinued earlier that month because Plaintiff was purportedly going to begin HCV treatment and he could not take the GERD medications at the same time (*Id.* at pp. 12, 13, 28; Doc. 122-2, p. 4). Specifically, Dr. Coe prescribed Prilosec, Pepcid, Tums, and metoclopramide for six months each (Doc. 138-1, pp. 13, 28). Plaintiff does not allege any deficiencies with Dr. Coe's course of treatment at this particular appointment (*see* Doc. 138, pp. 15–22; *see also* Doc. 19).

Dr. Coe saw Plaintiff again less than two months later on July 12, 2016 (Doc. 138-1, p. 15). Dr. Coe wrote that it was "not clear" why Plaintiff was being seen, perhaps it was because Plaintiff had back pain or perhaps it was a follow-up on an unspecified medical furlough. Dr. Coe noted that the liver biopsy report had not yet been received, and he ordered some kind of "lumbar support" for Plaintiff.

Throughout the remainder of 2016 and into 2017, Plaintiff had his labs drawn on a number of occasions and he was seen in the general medicine clinic for follow-up on his GERD and hypothyroidism, in the HCV chronic care clinic, and in the health care unit

as needed (*see* Doc. 138-1, pp. 14–18, 36–40; *see also* Doc. 138-2). Blood work in August 2016 showed his TSH level was 2.92, which was normal (Doc. 138-1, p. 37). At an appointment in the general medicine clinic in November 2016, his prescription for 0.25mg of levothyroxine was renewed (*Id.* at p. 17). Plaintiff continued taking Pepcid and Tums for his GERD (Doc. 138-1, p. 17; *see also* Doc. 138-2, p. 4), which he reported in November 2016 was "controlled with meds" (Doc. 138-1, p. 17). And he continued using Hibiclens soap for his rash, reporting in December 2016, "significant improvement" with the soap (Doc. 122-2, p. 9).

Plaintiff had a number of labs drawn on two occasions during the first half of February 2017 (Doc. 138-1, pp. 41, 42, 44). He then saw Dr. Coe for the last time on February 22nd to go over the results of his recent lab tests (*Id.* at p. 21). The labs drawn on February 9th showed Plaintiff's TSH was 2.96, which is normal (normal is 0.35–4.0) (*Id.* at p. 39). However, the labs drawn six days later showed it was high at 4.94 (*Id.* at p. 41). Dr. Coe renewed Plaintiff's thyroid medication for another six months, and it appears he increased the dosage from 0.25mg per day to 0.75mg per day (*Id.* at p. 21; *see also id.* at p. 17 (note from Nov. 2016 general medicine clinic appointment where Plaintiff was prescribed 0.25mg per day)). This appointment was the last time Plaintiff saw Dr. Coe.

Throughout the remainder of 2017 and into 2018, it appears that Plaintiff continued receiving Hibiclens soap to treat his skin problem (*see* Doc. 138-2, p. 7 (April 2017 grievance about Hibiclens refill); Doc. 138-2, pp. 10–11 (Feb. 2018 grievance about same); Doc. 138-2, p. 18 (May 2018 grievance about same)). Then on May 22, 2018, Plaintiff saw a nurse practitioner about his rash (Doc. 138-1, p. 23). The notes from this visit

indicate that Plaintiff was out of Hibiclens and reported that his rash was getting worse (*Id.*). The nurse practitioner diagnosed Plaintiff with eczema. She renewed his prescription for Hibiclens but also gave him triamcinolone cream and Eucerin cream. When she followed-up with Plaintiff a month later, he reported the creams "worked great" and his "eczema [was] almost cleared up" (*Id.* at p. 25). It appears that Plaintiff continued receiving the same or very similar soap and creams to treat his skin issues throughout 2019 and 2020 (*see* Doc. 138-2, p. 21 (May 2019 grievance about refill of triamcinolone cream and minerin cream); Doc. 138-2, p. 34 (March 2020 grievance about refill of Dyna Hex soap and minerin cream)). There is no indication in the records provided to the Court that any medical provider ever referred Plaintiff to a dermatologist (*see* Doc. 122-2; Doc. 138-1).

As for his GERD, it appears that practitioners continued to treat it with medications (*see* Doc. 138-2, p. 7 (April 2017 grievance about refill of Pepcid and Tums)); Doc. 138-2, p. 14 (May 2018 grievance response indicating Plaintiff's new prescription for Zantac was filled on May 14, 2018); Doc. 138-2, p. 15 (April 2019 grievance about Tums refill); Doc. 138-2, p. 18 (May 2018 grievance about Prevacid[17] refill); Doc. 138-2, p. 22 (May 2019 grievance about Tums)). Plaintiff states in his affidavit that in the summer of 2019, Dr. Pittman (who was apparently employed at Lawrence for a time) diagnosed him

---

[17] Prevacid (generic name lansoprazole) is a proton pump inhibitor that works by decreasing the amount of acid made in the stomach. It is used to treat GERD. MEDLINE PLUS, *Lansoprazole*, https://medlineplus.gov/druginfo/meds/a695020.html (last visited Sept. 17, 2021).

as having gastroparesis[18] and irritable bowel syndrome[19] (Doc. 138, p. 18; *see* Doc. 125, p. 2 n.3). There are no medical records currently before the Court that corroborate this testimony (*see* Doc. 122-12; Doc. 138-1). A medical record from the HCV chronic clinic indicates that Plaintiff was referred to the University of Illinois Chicago Liver Clinic, where he was seen in September 2019 (*see* Doc. 138-3, p. 7).  He complained of nausea, vomiting, food getting stuck when swallowed, and constipation, and the physician recommended an endoscopy ("EGD")[20] and a colonoscopy ("c-scope") (*Id.*). It appears that approval for those diagnostic tests was not actually sought until June 2020 (*see* Doc. 138-3, pp. 7–10). Those tests were performed in September 2020 (Doc. 138-3, pp. 12–21). The EGD revealed a two-centimeter hiatal hernia and mucosal changes in Plaintiff's

---

[18] Gastroparesis, also called delayed gastric emptying, is a disorder that slows or stops the movement of food from your stomach to your small intestine. People with gastroparesis may have other health problems including hypothyroidism. Symptoms of gastroparesis include nausea, vomiting, abdominal bloating and pain, feeling full after eating just a few bites, heartburn, and lack of appetite. NATL. INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES, *Gastroparesis*, https://www.niddk.nih.gov/health-information/digestive-diseases/gastroparesis (last visited Sept. 17, 2021).

[19] Irritable bowel syndrome (IBS) is a problem that affects the large intestine. It can cause abdominal cramping, bloating, and a change in bowel habits. Some people with the disorder have constipation. Some have diarrhea. Others go back and forth between the two. Although IBS can cause a great deal of discomfort, it does not harm the intestines. MEDLINE PLUS, *Irritable Bowel Syndrome*, https://medlineplus.gov/irritablebowelsyndrome.html (last visited Sept. 17, 2021).

[20] An upper endoscopy is a procedure used to examine your upper digestive tract, including the esophagus, stomach, and upper intestine (duodenum). It is commonly used to help find the cause of symptoms such as persistent heartburn and difficulty swallowing (dysphagia) and to identify problems such as GERD, elcers, and a hiatal hernia. NATL. INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY DISEASES, *Upper GI Endoscopy*, https://www.niddk.nih.gov/health-information/diagnostic-tests/upper-gi-endoscopy (last visited Sept. 17, 2021); JOHNS HOPKINS MEDICINE, *Upper GI Endoscopy*, https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/upper-gi-endoscopy (last visited Sept. 17, 2021); MAYO CLINIC, *Upper Endoscopy*, https://www.mayoclinic.org/tests-procedures/endoscopy/about/pac-20395197 (last visited Sept. 17, 2021); CLEVELAND CLINIC, *Upper Endoscopy*, https://my.clevelandclinic.org/health/treatments/4957-upper-endoscopy-procedure (last visited Sept. 17, 2021).

esophagus classified as a condition known Barrett's Esophagus (*Id.* at pp. 15–16; *see id.* at

p. 20 (explanation of Barrett's esophagus), but his stomach, duodenum, cardia and gastric

fundus were normal. The colonoscopy revealed internal hemorrhoids but an otherwise

normal colon (*Id.* at p. 16).

## B.  Prescription Refills

Plaintiff testified about the process for obtaining a prescription refill (Doc. 125-1,

p. 110). He said each medication comes with refill stickers. He puts the refill sticker on a

request slip and sends it "to medical." Refill requests are supposed to be sent in when the

inmate has ten days of medication remaining. He usually received his refills a couple

days after submitting his requests (Doc. 138-2, p. 4). In the event his prescription refill

was delayed, he first sent in a request slip inquiring about the status (Doc. 125-1 p. 113).

If he still had not received his medication "a couple days later," he might send a second

request slip or he might file a grievance (*Id.*). When he was out of refill stickers and

needed to have the prescription completely renewed, he would try to put in a request to

be seen in the Health Care Unit at least two weeks ahead of time (*Id.* at pp. 112–13).

At his deposition, Plaintiff was unable to provide any specific information about

instances when his medications were delayed and said he would have to review the

records, including the request slips that he submitted and the Medication Administration

Records, prescription packages that he made notes on, and grievances that he filed

regarding late prescription refills (Doc. 125-1, pp. 111, 112).

As part of his response brief, Plaintiff submitted the following grievances, which

document issues he experienced in getting his prescriptions refilled (Doc. 138-2).

- Emergency grievance dated March 16, 2015, indicating that he was transferred to Stateville without his medications (Doc. 138-2, p. 3).

- Emergency grievance dated February 7, 2017, indicating that he sent in refill requests on January 25th for his thyroid medication, Pepcid, Tums, and ibuprofen, but he still had not received the refills (Doc. 138-2, pp. 4–5). The counselor responded on February 15th, indicating that Plaintiff had received all of his refills by the date of the response.

- Emergency grievance dated April 4, 2017, indicating that he sent in refill requests on March 24th for his Pepcid, Tums, ibuprofen, and Hibiclens soap but he still had not received the refills (Doc. 138-2, pp. 7–8). It was deemed a non-emergency by the Warden.

- Emergency grievance dated February 26, 2018, indicating that he sent in refill requests on January 27th and received all of his refills except for the Hibiclens soap (Doc. 138-2, pp. 10–11). He received the Hibiclens on February 26th, the date of the grievance (*Id.* at pp. 11. 14).

- Emergency grievance dated May 14, 2018, indicating that his ibuprofen refill was three days late, and he still had not received his prescriptions for Nasacort and saline nasal spray, which he believed were supposed to be filled within "24 hours after 5-1-18" (Doc. 138-2, p. 18). It was deemed a non-emergency by the Warden.

- Emergency grievance dated April 21, 2019, indicating that he put in for a refill of Tums two weeks prior but still had not received the medication (Doc. 138-2, p. 15). The Warden determined it was not an emergency. The counselor responded on May 14th, stating that according to the Health Care Unit, there was no refill request in his chart. He was put on the list to be seen by the doctor to discuss his medication.

- Emergency grievance dated May 7, 2019, indicating that he sent in refill requests on April 29th but still had not received his prescriptions (Doc. 138-2, pp. 19–20). The warden deemed it an emergency on May 9th and the grievance officer received it that same day. The grievance officer responded on May 14th, stating that the Health Care Unit Administrator ("HCUA") confirmed that Plaintiff still had not received his fish oil, minerin cream, saline nasal spray, or vitamin B12. He was "placed on MD line for assessment."

- Emergency grievance dated May 13, 2019, indicating that he was call passed to medical on May 11th to pick up his medications (which was after the grievance officer received his previous grievance but before she had responded), but he did not receive triamcinolone cream, minerin cream, saline nasal spray, calcium tablets, or fish oil (Doc. 138-2, pp. 21–22). This grievance corresponds with and is a continuation of the previous grievance dated May 7th. The warden also deemed this one an emergency on May 17th. The grievance officer responded on May 22nd, indicating that the HCUA confirmed Plaintiff still had not received some of his medications, but the list was slightly different this time. The HCUS indicated that Plaintiff still needed fish oil and saline nasal spray as well as Tums and triamcinolone cream, but not minerin cream.

- Emergency grievance dated July 3, 2019, indicating that he did not receive his monthly refills of fish oil or saline nasal spray or his weekly supply of batteries for his hearing aid (Doc. 138-2, pp. 24–25). The grievance was upheld and the HCUA confirmed that as of July 16th, Plaintiff still had not received his medications.

- Emergency grievance dated November 17, 2019, indicating that he sent in refill requests on November 12th but still had not received his prescriptions and he was due to run out of his thyroid medication on the 24th (Doc. 138-2, pp. 27–28). The grievance was responded to on November 26th and said Plaintiff had received all of his medications.

- Emergency grievance dated February 26, 2020, indicating in pertinent part that medical was ignoring the request he sent on the 10th stating that his ibuprofen needed to be renewed (Doc. 138-2, pp. 29–30). In response, the HCUA indicated that Plaintiff's medications expired on February 18th and the physician was notified. He was not seen until April 14th regarding the expired ibuprofen prescription, and it was renewed.

- Emergency grievance dated March 2, 2020, indicating that he sent in refill requests on February 23rd but still had not received his refill of loratadine (allergy medication) (Doc. 138-2, pp. 31–33). Response dated March 6th indicates that Plaintiff had received his medication.

- Emergency grievance dated March 18, 2020, indicating that he submitted a request slip on the 10th to see the doctor because various permits and medications had expired and he needed them renewed (including loratadine, fish oil, minerin cream, saline nasal spray, ibuprofen, and Dyna Hex soap) but

he still had not been seen (Doc. 138-2, pp. 34–35). There is no indication if, when, or how this issue was resolved.

- Emergency grievance dated June 10, 2020, indicating he had not received his refills of thyroid medication, vitamins B12, C, and D3, or niacin (Doc. 138-2, p. 36). There is no indication if, when, or how this issue was resolved.

- Emergency grievance dated October 6, 2020, indicating that he sent in refill requests on September 25th for his thyroid medication and loratidine but still had not received his prescriptions (Doc. 138-2, pp. 38–39). The HCUA indicated that, as of October 13th, Plaintiff had received his medications.

- Emergency grievance dated October 28, 2020, indicating that he sent in a refill request on the 18th for his Tylenol but still had not received it (Doc. 138-2, pp. 40–41). The HCUA responded that Plaintiff's medication was issued as ordered on October 10th and he was seen by a nurse practitioner on November 4th.

## LEGAL STANDARDS

Summary judgment is proper "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party always bears the initial responsibility of showing that it is entitled to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). The manner in which this showing can be made depends upon which party will bear the burden of proof on the challenged claim(s) at trial. *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting). In cases such as this one, where the burden of proof at trial rests on the plaintiff, the defendant can make its initial showing on summary judgment in one of two ways. *Id.*; *see Hummel v. St. Joseph Cty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016); *Modrowski*, 712 F.3d at 1168. First, the defendant can show that there is an absence of evidence—meaning a complete failure of proof—supporting an essential element of the plaintiff's claim. *Celotex*, 477 U.S.

at 331; *Hummel*, 817 F.3d at 1016. Second, the defendant can present affirmative evidence that negates an essential element of the plaintiff's claim. *Celotex,* 477 U.S. at 331; *Hummel*, 817 F.3d at 1016.

If the movant fails to carry its initial responsibility, the motion should be denied. *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 415 (7th Cir. 2019). On the other hand, if the movant does carry its initial responsibility, the burden shifts to the non-moving party to "inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 455 (7th Cir. 2018) (citation omitted). The non-moving party cannot rely on allegations in the pleadings but rather must come forward with evidentiary materials that set forth "specific facts showing that there is a *genuine issue for trial*" on all essential elements of his case. *Celotex*, 477 U.S. at 324; *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009); *see also* FED. R. CIV. P. 56(c)(1). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In deciding a motion for summary judgment, the court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014).

The Eighth Amendment's proscription against cruel and unusual punishment creates an obligation for prison officials to provide inmates with adequate medical care.

*Minix v. Canarecci*, 597 F.3d 824, 830 (7th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, (1994)). Evaluating whether the Eighth Amendment has been violated in the prison medical context involves a two-prong analysis. The court first looks at whether the plaintiff suffered from an objectively serious medical condition and, second, whether the "prison officials acted with a sufficiently culpable state of mind," namely deliberate indifference. *E.g., Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In applying this test, the court "look[s] at the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Petties v. Carter*, 836 F.3d 722, 728–29 (7th Cir. 2016).

With respect to the first prong, "[a]n objectively serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Importantly, "[a] medical condition need not be life-threatening to be serious." *Id.* It can be a condition that "significantly affects an individual's daily activities" or a condition that would result in further significant injury or chronic and substantial pain if left untreated. *Hayes v. Snyder*, 546 F.3d 516, 522–23 (7th Cir. 2008).

As for the second prong, a prison official exhibits deliberate indifference when they know of a serious risk to the prisoner's health exists but they consciously disregard that risk. *Holloway*, 700 F.3d at 1073 (citation omitted). "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Rasho v. Elyea*, 856 F.3d 469,

476 (7th Cir. 2017) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). The deliberate indifference standard "requires more than negligence and it approaches intentional wrongdoing." *Holloway*, 700 F.3d at 1073. It is "essentially a criminal recklessness standard, that is, ignoring a known risk." *McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (citation omitted).

## A.  DR. JOHN COE

Plaintiff's claim against Dr. Coe is that he failed to diagnose and adequately treat his thyroid issues, rash, and gastrointestinal issues (Doc. 125-1, p. 66; *see* Doc. 138)

In the context of medical professionals, the deliberate indifference standard has been described as the "professional judgment standard." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008). Treatment decisions are "presumptively valid" and entitled to deference so long as they are based on professional judgment—meaning they are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments—and do not go against accepted professional standards. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citation omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). A medical professional may be held to have displayed deliberate indifference if the treatment decision was "blatantly inappropriate" even to a layperson, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious."), or there is evidence that the treatment decision was "such a substantial departure from accepted professional

judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties*, 836 F.3d at 729; *see also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'") (citation omitted).

### 1. Thyroid Condition

Plaintiff's first appointment with Dr. Coe was in February 2015. At this time, Plaintiff thought it possible that he had a thyroid problem and he believes Dr. Coe should have tested his TSH level. But Plaintiff's expectation that Dr. Coe would implement a course of treatment based on Plaintiff's word alone is not evidence that his treatment decision was medically unsound. *See Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (explaining that decisions about the need for diagnostic testing are "a classic example of a matter of medical judgment" (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976))). This appointment was the first time Dr. Coe had ever met or laid eyes on Plaintiff. Plaintiff basically reported a raft of gastrointestinal issues and that he was tired (Doc. 125-1, pp. 74–76; Doc. 138, p. 16). Fatigue, of course, can be attributable to a plethora of things, some medical, some not.[21] Given Plaintiff's symptoms, it does not strike the Court as obviously wrong and blatantly inappropriate for Dr. Coe not to order a test of Plaintiff's TSH level. However, the presentation of thyroid dysfunction is not the type of medical issue that is

---

[21] Notably, fatigue is a symptom of Hepatitis C. *See* MEDLINE PLUS, *Hepatitis C*, https://medlineplus.gov/hepatitisc.html (last visited Sept. 20, 2021).

within a layperson's realm of knowledge. *See* William J. Hueston, M.D., *Treatment of Hypothyroidism*, 64 AM FAM PHYSICIAN 1717–25 (2001) ("The signs and symptoms of hypothyroidism are nonspecific and may be confused with those of other clinical conditions . . . ."). Plaintiff did not provide any additional evidence, such as expert testimony, indicating that Dr. Coe's decision not to order testing was so far outside the bounds of professional judgment that no reasonable physician would make the same decision.

Additionally, the fact that Dr. Paul ordered a test of Plaintiff's TSH level three months later in late May 2015 is not sufficient to conclude that Dr. Coe should have done so in February because "evidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729 (emphasis in original); *see also Pyles*, 771 F.3d at 409 ("Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation."). Furthermore, Plaintiff testified that when he saw Dr. Paul his "liver numbers" were once again very high and Dr. Paul suspected the fluctuation could be attributable to a thyroid problem. There is no indication that Dr. Coe had these same lab results at the time he saw Plaintiff in February 2015 or that he had the same level of knowledge as Dr. Paul about the relationship between HCV, liver enzymes, and hypothyroidism.  At any rate, Plaintiff's TSH level was within the normal range when Dr. Paul tested it in May 2015.

Plaintiff next saw Dr. Coe on July 7, 2015, primarily for his GERD. There is no evidence suggesting it was blatantly inappropriate or a substantial departure from accepted medical judgment to not retest Plaintiff's TSH level only a month and a half after blood work showed his level was normal.

Plaintiff did not see Dr. Coe again until February 2016. Again, there is simply no evidence in the record that suggests it was blatantly inappropriate or a substantial departure from accepted medical judgment to not retest Plaintiff's TSH level at that time. In fact, Plaintiff also saw Dr. Paul in February, and when she ordered lab tests in advance of this appointment, she apparently did not think it was necessary to retest Plaintiff's TSH level (*see* Doc. 138-1, p. 5) (labs drawn for comprehensive metabolic panel, complete blood count, and liver profile). There is also no evidence in the record that Dr. Paul ordered labs to test Plaintiff's TSH following this appointment, despite Plaintiff's expanded list of thyroid-related complaints, including weight gain, feeling cold, fatigue, frequent headaches and joint aches (*see* Doc. 122-2, Doc. 138-1). Dr. Paul did, however, order Plaintiff to follow-up with a practitioner at Lawrence, who in turn ordered a TSH test. The labs showed that Plaintiff's TSH was above normal limits, and Plaintiff was immediately diagnosed with hypothyroidism and started on thyroid medication. Plaintiff continued to see practitioners other than Dr. Coe through the remainder of 2016 and into 2017, who monitored his TSH level periodically (*see* Doc. 138-1, pp. 9, 14–18, 32, 33, 35, 36–40, 41, 44).

Plaintiff claims that when he saw Dr. Coe in April 2016, he was "having problems adjusting to the lower dose of thyroid medication" but Dr. Coe refused to do anything.

At that point, Plaintiff had only been on that dosage for nine days (*see* Doc. 138-1, pp. 9

11). There is absolutely no evidence in the record that Dr. Coe's refusal to tweak Plaintiff's

dosage after such a short period of time deviated substantially from accepted professional

judgment.[22] Dr. Coe did not see Plaintiff about his thyroid again until February 2017,

which was the last time he saw Plaintiff. At that appointment, Dr. Coe increased

Plaintiff's thyroid medication, presumably because blood work showed his TSH level

was still high (Doc. 138-1, p. 21). Plaintiff has not put forth any evidence that this

treatment decision was far outside the bounds of professional judgment.

Simply put, based on the evidence currently before the Court, no reasonable jury

could find that Dr. Coe was deliberately indifferent to Plaintiff's thyroid issues. Plaintiff

apparently believes that his thyroid function should have been tested sooner and

monitored more frequently, and that Dr. Coe should have been involved (Doc. 125-1, pp.

67, 76, 89; Doc. 138, p. 21). Plaintiff also believes he should have been sent to a specialist

when his TSH levels were still in the normal range but high (Doc. 125-1, p. 92), and that

his thyroid medication was mismanaged and the dosage should have been increased

(Doc. 138, p. 5). However, a prisoner is "not entitled to demand specific care and is not

entitled to the best care possible." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011)

(citation omitted). Prisoners are only "entitled to reasonable measures to meet a

substantial risk of serious harm." *Id.* Furthermore, a plaintiff's own speculative beliefs

---

[22] *But see, e.g.,* AM. THYROID ASSOC., *Thyroid Q & A: TSH (thyroid stimulating hormone),* https://www.thyroid.org/patient-thyroid-information/what-are-thyroid-problems/q-and-a-tsh-thyroid-stimulating-hormone/ (last visited Sept. 17, 2021) ("Your doctor will usually wait 6-8 weeks after a thyroxine dose adjustment to measure your TSH, when the levels of thyroxine have reached a steady state.").

about the efficacy of their medication is not enough to establish deliberate indifference. *Thomas v. Martija*, 991 F.3d 763, 772–73 (7th Cir. 2021) (citation omitted) (affirming no jury could conclude doctor acted with deliberate indifference when he chose to continue plaintiff's Flomax prescription, despite plaintiff's belief that it was ineffective for him, because it was the widely accepted treatment for an enlarged prostate and several doctors believed it was the proper drug). "The challenged plan must deviate so substantially from accepted professional judgment that no reasonable physician would reach the same judgment." *Id.* (citation omitted). The medical records show that Plaintiff was being seen regularly, primarily by medical professionals other than Dr. Coe, to evaluate, monitor, and treat his thyroid function. None of Dr. Coe's treatment decisions (or decisions not to treat) regarding Plaintiff's thyroid condition were so obviously wrong that even a layperson could draw the required inference about Dr. Coe's state of mind. Plaintiff also did not put forth any expert testimony that the treatment decisions were so far afield of accepted professional standards as to raise the inference that they were not actually based on a medical judgment.

For these reasons, Dr. Coe is entitled to summary judgment on this aspect of Plaintiff's deliberate indifference claim.

### 2. Rash

According to Plaintiff, he started developing a rash in August 2015 (Doc. 19, p. 17; Doc. 138, pp. 5, 16, 26). The first time he saw Dr. Coe thereafter was in February 2016 (*see* Doc. 122-2, Doc. 138-1). Plaintiff said that he mentioned the rash to Dr. Coe at this appointment, but Dr. Coe ignored his complaints (Doc. 138, p. 16). Even if true, there is

no evidence in the record from which it could be inferred that the rash constituted an objectively serious medical need at this point in time. Specifically, the evidence suggests that the rash was initially only on Plaintiff's back (*see* Doc. 19, p. 17; Doc. 138, p. 26; Doc. 138-1, p. 7). Plaintiff stated in a grievance that he "assumed [the rash] was due to night sweats and not being allowed to shower enough" (Doc. 138, p. 26). There is no indication that Plaintiff sought or received medical care for the rash at any time in the six or so months after it purportedly began in August 2015 but prior to seeing Dr. Coe in February 2016 (*see* Doc. 138, pp. 5–6, 16–19, 24–28). Later that same month, a medical provider acknowledged the rash for the first time and thought the only treatment necessary was five days of Benadryl (Doc. 138-1, p. 7). Plaintiff never indicated that the rash impacted his daily activities to any extent, nor did he indicate that it caused any pain (let alone substantial pain), stinging, or itching whatsoever (*see* Doc. 125-1; Doc. 138, pp. 5–6, 16–19, 24–28; Doc. 138-1, pp. 7, 8, 9, 11, 13). Given the dearth of evidence regarding the rash, no reasonable jury could conclude that the rash constituted a serious medical need in February 2016.

The next time Plaintiff saw Dr. Coe in April 2016, he still had the rash despite being given Benadryl and an antibiotic by other practitioners. Dr. Coe did not exhibit deliberate indifference to the rash; rather, he gave Plaintiff a different diagnosis and prescribed a new type of treatment: Hibiclens soap. The following month Dr. Coe noted Plaintiff's "folliculitis" was "controlled" by using Hibiclens and continued Plaintiff's prescription. There is no indication that Plaintiff expressed any further complaints to Dr. Coe about his

rash or the Hibiclens prescribed to treat it. In fact, in December 2016, Plaintiff reported his rash had significantly improved by using Hibiclens.

Plaintiff's main contention seems to be that Dr. Coe was deliberately indifferent because he refused Plaintiff's request to send him to a dermatologist (Doc. 138, p. 18). But, as previously stated, a prisoner is "not entitled to demand specific care and is not entitled to the best care possible." *Arnett*, 658 F.3d at 754 (citation omitted). And "[a] prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). "Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is 'blatantly inappropriate.'" *Id.* (citations omitted). In this instance, there is no evidence from which a jury could conclude that Dr. Coe's decision not to refer Plaintiff to a dermatologist was blatantly inappropriate, particularly given that all of the other practitioners who saw Plaintiff for his rash came to the same conclusion that a referral was not necessary. *See Pyles*, 771 F.3d at 411 (reasonable jury could not find doctor's decision not to order an MRI departed significantly from accepted professional norms when that decision was "implicitly endorsed by every other doctor who examined Mr. Pyles" and likewise decided not to order an MRI).

Accordingly, Dr. Coe is entitled to summary judgment on this aspect of Plaintiff's deliberate indifference claim.

### 3.  Gastrointestinal Issues

The evidence in this case is that Dr. Coe diagnosed Plaintiff with GERD in February 2015 and prescribed him two different medications to treat it. Every time Dr. Coe saw Plaintiff thereafter regarding his GERD, he prescribed medications to address Plaintiff's gastrointestinal issues. And Dr. Coe changed or added to Plaintiff's medications from time to time in order to see if a different or additional medication would offer more relief. However, Plaintiff contends that Dr. Coe was nevertheless deliberately indifferent. He takes exception to Dr. Coe diagnosing him with GERD without performing any diagnostic tests or documenting the symptoms the diagnosis was based on (Doc. 130, p. 21). He also thinks Dr. Coe treated only select symptoms and ignored others (Doc. 138, p. 2). Specifically, Plaintiff says Dr. Coe ignored his complaints about severe gas and constipation and could have prescribed him Gas-X or Miralax (Doc. 138, pp. 2, 3; Doc. 125-1, pp. 77–78). Plaintiff also thinks Dr. Coe should have looked into Plaintiff's concern about a soy allergy and ordered him a "medical diet" with no soy (Doc. 138, p. 2; Doc. 125-1, p. 75). Additionally, Plaintiff claims Dr. Coe would not order follow-up appointments to occur before Plaintiff's prescriptions expired (Doc. 138, p. 2; Doc. 125-1, pp. 71, 84, 91, 92). And Plaintiff was upset that Dr. Coe continually treated his symptoms without making any real effort to investigate the underlying cause of his issues (*see, e.g.,* Doc. 125-1, pp. 117, 118; Doc. 138, pp. 20, 21).

But no reasonable jury could conclude that the issues identified by Plaintiff amounted to deliberate indifference. To begin with, by Plaintiff's own admission, he initially presented with classic symptoms of GERD, including severe heartburn,

indigestion, and reflux (*see, e.g.,* Doc. 138, p. 25).[23] And "[i]n most cases, doctors diagnose [GERD] by reviewing [the patient's] symptoms and medical history. . . . and may recommend treatment with medicines and lifestyle changes, instead of doing tests."[24] Dr. Coe's decision to approach the issue conservatively without testing was not obviously wrong or blatantly inappropriate, and Plaintiff provided no evidence that it was a significant departure from accepted professional norms (*see* Doc. 138).

To the extent that Dr. Coe failed to address some of Plaintiff's symptoms, such as gas, constipation, and/or diarrhea, it bears mentioning that, based on the medical records currently before the Court, *none* of the medical providers that Plaintiff saw between 2015 and 2017, not just Dr. Coe, ever documented any complaint from Plaintiff about these symptoms (*see* Doc. 122-2, Doc. 138-1). Additionally, it simply does not make any sense that Dr. Coe would be open to treating some gastrointestinal issues (heartburn and reflux) but not others (gas, constipation, diarrhea), particularly when the only treatment Plaintiff was seeking was over-the-counter medications like Gas-X or Miralax. Setting those suspicions aside, however,  *e.g., Paz v. Wauconda Healthcare & Rehab. Ctr., LLC*, 464 F.3d 659, 664 (7th Cir. 2006) ("At summary judgment, a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts;

---

[23] *See* NAT'L INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY ISSUES, *Symptoms and Causes of GER & GERD*, https://www.niddk.nih.gov/health-information/digestive-diseases/acid-reflux-ger-gerd-adults/symptoms-causes (last visited Sept. 17, 2021).

[24] NAT'L INSTITUTE OF DIABETES AND DIGESTIVE AND KIDNEY ISSUES, *Diagnosis of GER & GERD*, https://www.niddk.nih.gov/health-information/digestive-diseases/acid-reflux-ger-gerd-adults/diagnosis (last visited Sept. 17, 2021).

these are jobs for a factfinder."), there are other problems that preclude Plaintiff from surviving summary judgment.

To begin with, Plaintiff has not provided the Court with any details about these symptoms, such as frequency, intensity, or duration (*see* Doc. 138; Doc. 125-1). Consequently, there is no basis for a jury to find they constituted objectively serious medical needs. Furthermore, Plaintiff saw a number of other practitioners both during the time that Dr. Coe was at Lawrence and after, and there is no indication in the records before the Court that any of them ever thought it necessary to prescribe him Gas-X or Miralax (*see* Doc. 122-2; Doc. 138-1). Therefore, the Court cannot say that Dr. Coe's decision was obviously wrong or blatantly inappropriate, and it stands to reason that Dr. Coe's decision not to do so did not depart significantly from accepted professional norms.

As for Plaintiff's concern about a soy allergy, Dr. Coe was not required to indulge Plaintiff's every suspicion. There is no evidence in the record that any of the practitioners Plaintiff saw at Lawrence were ever concerned about a soy allergy or had him tested for one. It is also unclear if, and when, the special type of diet Plaintiff wanted was even available at Lawrence (*see* Doc. 125-1, pp. 126–27, 135–136, 137–38). But even if it was a treatment option for Dr. Coe, Plaintiff has not put forth any evidence that it was essentially mandated by accepted professional standards. Nor was the decision not to order a soy-free diet obviously wrong even to a layperson. At most, Plaintiff's evidence shows that a no-soy diet was another potential treatment option and perhaps it would have been beneficial.

As for the fact that Dr. Coe did not automatically schedule Plaintiff for follow-up appointments to refill his medications, and instead relied on Plaintiff to seek out further treatment, the Court understands why this was frustrating to Plaintiff, and perhaps even felt unfair given that Plaintiff was supposed to pay a co-pay each time. However, Plaintiff has not made any argument or provided any legal authority demonstrating that it was *unconstitutional*. After all, this is not a situation unique to prisoners; many physicians on the outside also require their patients to take initiative and schedule their own follow-up appointments. Furthermore, the records demonstrate there were instances where Dr. Coe *did* order a follow-up appointment that apparently never got scheduled (*see, e.g.,* Doc. 138-1, p. 5). Scheduling is typically a task that falls on a physician's support staff, not the physician himself. In this instance, Plaintiff has not put forth any evidence that suggests scheduling was Dr. Coe's responsibility (*see* Doc. 138).

Finally, with respect to Plaintiff's assertion that Dr. Coe should have done more to investigate the underlying cause of Plaintiff's gastrointestinal issues, again, there is no evidence from which a jury could find he was deliberately indifferent. Plaintiff reported to another practitioner in November 2016 that his GERD was "controlled with meds" (Doc. 138-1, p. 17). And he saw a number of other practitioners both during the time that Dr. Coe was at Lawrence and after, and there is no indication in the records before the Court that any of them thought it necessary to order any type of diagnostic tests until years later (*see* Doc. 138-3, p. 7). Consequently, the evidence does not give rise to an inference that Dr. Coe's treatment decisions were a substantial departure from accepted medical practice when a number of other practitioners also treated his GERD symptoms

with medication and forewent any diagnostic testing. And Plaintiff did not provide any expert testimony that Dr. Coe's treatment decisions were so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment.

The Court appreciates that Plaintiff was deeply worried about his health and certainly understands that he was frustrated and disappointed in the lack of concern he thought Dr. Coe exhibited, the course of treatment Dr. Coe prescribed, and Dr. Coe's failure to discuss a long-term plan with him for handling his symptoms. But it is well-established "[m]ere dissatisfaction or disagreement with a doctor's course of treatment is generally insufficient" to establish deliberate indifference. *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (citations omitted); *accord Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "The federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents [a] significant a departure from accepted professional standards . . . ." *Pyles*, 771 F.3d at 409. Here, there is simply no evidence that Dr. Coe's decisions met that standard. The records before the Court—which are not even Plaintiff's full medical record—demonstrate that from 2015 through 2017, he received a significant amount of medical care and monitoring of his medical conditions. He had at least 20 appointments with Dr. Coe, specialists with the HCV clinic, other physicians, nurse practitioners, and physician assistants and his labs were collected more than a dozen times. The fact that the care Plaintiff received was not as effective as he would like and did not completely alleviate his symptoms is not enough to support an Eighth Amendment claim. *See, e.g., Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) ("It

would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating.").

For these reasons, no reasonable jury can find that Dr. Coe was deliberately indifferent to Plaintiff's GERD and Dr. Coe is entitled to summary judgment on this aspect of Plaintiff's claim.

## B. WEXFORD

A private corporation acting under the color of state law, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). Under *Monell*, a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir.2010)). There are three primary ways in which one might prove that the corporation itself inflicted the harm: the alleged unconstitutional action implements or executes an official policy, the action was done pursuant an informal but widespread and well-settled practice or custom, or the action was taken by an official of the corporation with final policymaking authority. *Thomas v. Martija*, 991 F.3d 763, 773 (7th Cir. 2021); *Glisson*, 849 F.3d at 379.

In Count 1, Plaintiff alleges that Dr. Coe refused to discuss multiple complaints or issues at appointments because Wexford has implemented a cost-cutting policy directing staff to restrict sick call referrals and medical appointments to one medical issue per visit (Doc. 19, Doc. 22). And prisoners must request additional appointments to discuss their other issues (Doc. 19, Doc. 22). Plaintiff alleged that Dr. Coe enforced this policy because,

if he successfully controls costs, he receives financial incentives from Wexford (Doc. 19, Doc. 22). However, the Court has already concluded that Plaintiff failed to show an issue of fact as to whether Dr. Coe was individually liable for deliberate indifference. Therefore, he did not suffer an actionable injury from the widespread practice he attributes to Wexford. *See, e.g., Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013). Furthermore, the medical records plainly demonstrate that medical providers, including Dr. Coe, frequently addressed multiple issues at a single appointment (Doc. 138-1, pp. 7, 8, 11, 13, 17, 25). Consequently, Wexford is entitled to summary judgment on Count 1.

In Count 2, Plaintiff alleged Wexford was deliberately indifferent for maintaining policies and customs that resulted in a failure to timely refill Plaintiff's prescription medications. To be clear, this is not a generalized claim that Plaintiff had problems obtaining his prescriptions medications for any number of reasons. The claim is that Plaintiff requested a refill of his prescription medication(s), the request was received, but delivery of the refill was delayed.

This claim invokes the second theory of liability under *Monell*: a widespread custom or practice. To support a § 1983 claim on this theory, Plaintiff must show that Wexford's "practice in refilling prescriptions violated his constitutional rights," meaning the medications were medically necessary to treat his serious health conditions but were not provided in a timely manner, exposing him to a substantial risk of serious harm or pain. *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527 (2021) (quoting *Phelan v. Cook Cty.*, 463 F.3d 773, 789, 790 (7th Cir. 2006)). Plaintiff must also

show that the "practice was 'so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.'" *Hildreth*, 960 F.3d at 426 (quoting *Phelan*, 463 F.3d at 789, 790). "This requires 'more than a showing of one or two missteps.' There must be 'systemic and gross deficiencies.'" *Hildreth*, 960 F.3d at 426 (quoting *Phelan*, 960 F.3d at 426)). *See also Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) ("What is needed is evidence that there is a true [corporate] policy at issue, not a random event. . . . [It cannot just be] the isolated wrongdoing of one or a few rogue employees . . . .").

Here, Wexford argues in its motion for summary judgment that there is an absence of evidence—meaning a complete failure of proof—as to any instance where Plaintiff's prescription refills were delayed (Doc. 122, p. 17). But then in his response brief, Plaintiff provided a number of grievances as evidence of times when his prescriptions were not filled on time (Doc. 138-2). Wexford, in its reply brief, argued *only* that the grievances should be stricken because they were not produced to Defendants during the course of discovery (*see* Doc. 140). The Court, however, disagreed and declined to strike the grievances (*see* Doc. 150 ).Wexford made no argument in the alternative as to why the grievances were insufficient to establish an unconstitutional pattern or practice (*see* Doc. 140). That being said, the Court thinks it is pretty obvious under Seventh Circuit precedent that the grievances are, in fact, insufficient to establish an unconstitutional

pattern or practice. The Court is inclined to grant summary judgment to Wexford on Count 2 pursuant to Rule 56(f).[25]

To support his claim, Plaintiff submitted 16 grievances showing alleged instances in which his own prescription refills were delayed (Doc. 138, p. 20; *see* Doc. 138-2).[26] "While it is not 'impossible' for a plaintiff to demonstrate a widespread practice or custom with evidence limited to personal experience, 'it is necessarily more difficult . . . because what is needed is evidence that there is a true [corporate] policy at issue, not a random event.'" *Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020), *cert. denied*, 141 S. Ct. 1527 (2021) (quoting *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008)).

To begin with, not all 16 grievances are actually about delays in prescription refills. The March 2015 grievance is about not receiving his medications after he was transferred to Stateville (Doc. 138-2, p. 3). The April 2019 grievance and response indicates that Plaintiff's request for a refill of Tums was never received (Doc. 138-2, p. 15); this is a different situation—a delay cannot be presumed if the refill request was never received. The February 2020 grievance is about Plaintiff's ibuprofen prescription expiring and

---

[25] Under Federal Rule of Civil Procedure 56(f), the Court may grant summary judgment independent of a motion provided the parties are given notice and a reasonable time to respond. FED. R. CIV. P. 56(f).

[26] He claims these grievances are only a "fraction" of all the instances that his prescriptions were delayed (Doc. 138, pp. 19, 20). However, this vague statement unsupported by any corroborating evidence is not evidence that can be considered on summary judgment. *Castelino v. Rose-Hulman Inst. of Tech.*, 999 F.3d 1031, 1040 (7th Cir. 2021) ("In considering a motion for summary judgment the court is not obligated . . . to assume the truth of a nonmovant's conclusory allegations on faith . . . .") (citation and internal quotation marks omitted); *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972 (7th Cir. 2020) (on summary judgment, "the non-moving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence.") (citation omitted); *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) ("Summary judgment is not a time to be coy: conclusory statements not grounded in specific fact are not enough.") (citation and internal quotation marks omitted).

being unable to get an appointment scheduled to renew it (Doc. 138-2, pp. 29–30). Again, a problem of a different kind. The same goes for the March 18, 2020 grievance, which is also about expired prescriptions and being unable to get an appointment to have them renewed (Doc. 138-2, pp. 34–35). Consequently, these four grievances cannot be considered as part of the alleged widespread custom or practice at issue.

Additionally, some of the grievances complain about delays for which there is no evidence that could support a finding that a constitutional violation occurred. For example, the November 2019 grievance suggests that Plaintiff's medications were not refilled as quickly as he thought they should have been, but he had not yet run out of medication (Doc. 138-2, pp. 27–28). In other words, it was a preemptive grievance, and Plaintiff filed it in the hopes he could avoid running out of his medication. Given that there is no evidence Plaintiff actually went without medication for any period of time before he received the refill, he was never exposed to a substantial risk of serious harm, and thus there was no potential constitutional violation.

Other grievances complain about delayed prescriptions for which there is no evidence that the prescriptions at issue were *necessary* to treat a serious medical condition, as opposed to being merely beneficial. Specifically, the February 2018 grievance is about Plaintiff not receiving his Hibiclens soap in a timely manner. However, as previously discussed in this Order, the Hibiclens was prescribed to treat Plaintiff's rash but there is no evidence in the record from which it could be inferred that the rash constituted an objectively serious medical need. Likewise, there is no evidence that making him go without the Hibiclens for any length of time exposed him to a substantial risk of serious

harm. In other words, the failure to provide him with Hibiclens soap in a timely manner cannot be deemed a constitutional violation. The same goes for the minerin cream and triamcinolone cream that were prescribed to treat his rash.

Plaintiff also complained about not receiving refills of several prescribed supplements, including fish oil, vitamin B12, C, D3, and niacin (Doc. 138-2, pp. 19–20, 21–22, 36). There is no evidence in the record regarding the reasons these supplements were prescribed or what condition they were intended to treat. Consequently, no inference can be drawn that they were *necessary* to treat a serious medical condition and without them Plaintiff faced a substantial risk of serious harm. The same goes for Plaintiff's prescriptions for saline nasal spray, Nasacort, and loratadine (allergy medication). The Court has no idea why these medications were prescribed to Plaintiff in 2018, 2019, or 2020 or the specifics and severity of the condition they were intended to treat. Consequently, these alleged instances of prescription delays cannot be considered as part of the alleged widespread custom or practice at issue.

What the Court is left with, then, is the following:

- February 2017 delay in refilling thyroid medication, Pepcid, Tums, and ibuprofen;

- April 2017 delay in refilling Pepcid, Tums, and ibuprofen;

- May 2018 delay in refilling ibuprofen;

- May 2019 delay in refilling Tums;

- July 2019 delay in providing batteries for Plaintiff's hearing aid;

- June 2020 delay in refilling thyroid medication;

- October 6, 2020 delay in refilling thyroid medication; and

- October 28, 2020 delay in refilling Tylenol.

That is eight instances over the course of about four years (44 months) in which refills of prescriptions necessary to treat serious medical conditions were delayed (or an average of approximately 2.18 incidents per year). This is simply not enough to foster a genuine issue of material fact that the practice of delaying prescription refills was widespread. *See Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008) (holding four incidents over about 11 months involving only plaintiff was insufficient to show a widespread practice or custom); *Hildreth*, 960 F.3d at 429 (holding three incidents of late medication refills over nineteen months (or 1.89 incidents per year) involving only the plaintiff was insufficient to show a widespread practice). *See also Pittman ex rel Hamilton v. Cty. of Madison*, 746 F.3d 766, 780 (7th Cir. 2014) (holding 36 suicide attempts and three suicides in a five-year period (or 7.8 incidents per year) was not enough evidence of a widespread inadequate suicide policy); *Peterson v. City of Fort Worth*, 588 F.3d 838, 851 (5th Cir. 2009) (holding 27 complaints of excessive force over three years (or 9 incidents per year) were insufficient to establish a pattern); *Pineda v. City of Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (holding 11 incidents of warrantless entry over a 4-year period did not support an unconstitutional pattern).

Even if the Court were to consider all 16 of Plaintiff's grievances about his issues in obtaining his prescriptions for one reason or another, these instances occurred over the course of approximately five and a half years (or 67 months from March 2015 through October 2020), which only works out to an average of approximately 2.15 incidents per

year, for a single individual. Again, that is not enough to create a genuine issue of material fact that Wexford had a widespread practice or custom of delaying prescription refills.

For these reasons, the current record before the Court shows that Wexford is entitled to summary judgment on Count 2. Pursuant to Rule 56(f), the Court gives Plaintiff notice of its intent to grant summary judgment in Wexford's favor on this count. Plaintiff will be given an opportunity to respond and explain to the Court why summary judgment is not appropriate.

## C. Warden of Lawrence Correctional Center

The Court has granted summary judgment to Dr. Coe and Wexford as to Count 1 and has determined that Wexford is also entitled to summary judgment as to Count 2, but Plaintiff will be given a chance to convince the Court otherwise. Consequently, as it currently stands, Plaintiff is not entitled to any relief, including injunctive relief. The Warden's motion for summary judgment is therefore dismissed as moot. In the event the Court reverses course and does not grant summary judgment to Wexford on Count 2, the Warden and her motion for summary judgment will be reinstated and the Court will address the merits of the arguments therein.

## CONCLUSION

The Courts **GRANTS IN PART, MOOTS IN PART, and DEFERS RULING IN PART** on the motion for summary judgment filed by Defendants John Coe, Tammy Kimmel, and Wexford Health Sources, Inc. (Doc. 121). It is **MOOT** as to Ms. Kimmel, as

she was previously dismissed from this case (Doc. 137). It is **GRANTED** as to John Coe and Wexford on Count 1. Judgment will be entered in their favor at the conclusion of the case. Count 1 and John Coe are **DISMISSED with prejudice** as a Defendant in this action. The Court **DEFERS RULING** as to Count 2. The Court finds that based on the record as it currently stands, Wexford is entitled to summary judgment on Count 2. However, Plaintiff shall have an opportunity to respond. Such response is due within 30 days—on or before **October 20, 2021**—and must explain why summary judgment should not be awarded to Wexford and present competent evidence in support of his argument that demonstrates a genuine issue of material fact. Wexford's response, if any, is due **November 19, 2021**. Each party's brief shall not exceed 10 pages. No reply brief will be permitted. If Plaintiff fails to file a brief, summary judgment will be summarily granted for Wexford as to Count 2.

Defendant Dee Dee Brookhart's motion for summary judgment (Doc. 124) is **DISMISSED AS MOOT.** She is **DISMISSED without prejudice** as a Defendant in this action.

**IT IS SO ORDERED.**

**DATED: September 20, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**